**J.S.G. BOGGS, Appellant,**

v.

**Robert E. RUBIN, Secretary of the Treasury, et al., Appellees.**

**No. 97–5313.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1998.

Decided Nov. 6, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 3, 1999.*

---

* Circuit Judges Wald and Garland did not participate in this matter.

Kent A. Yalowitz argued the cause for appellant. With him on the briefs were Dennis G. Lyons and Stephen Sacks. Philip W. Horton entered an appearance.

Scott S. Harris, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: GINSBURG, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Separate opinion, concurring in part and dissenting in part, filed by Circuit Judge ROGERS.

SENTELLE, Circuit Judge:

Appellant J.S.G. Boggs, who describes himself as an internationally-recognized artist, creates images of currency which he uses in transactions designed to explore the meaning and value of money. He appeals from a district court grant of summary judgment ruling that his reproductions of United States currency violate federal counterfeiting statutes, making them contraband *per se* and forfeit as a result. Boggs raises three claims of error before this court. First, he argues that his "Boggs Bills" are protected by the First Amendment, and that this case is controlled by the line of cases creating increased preseizure procedural safeguards for expressive materials. Because those safeguards were not observed, he argues, it was improper for the district court to reach a judgment

on the merits. Second, he argues that the district court erred by conducting an *in camera, ex parte* examination of his work when ruling on cross-motions for summary judgment. Finally, he contends that the court below applied the wrong standard in determining that the bills are counterfeit. Boggs argues that these errors require us to order the government to return his artwork, or grant him an adversarial hearing in open court. We disagree. The district court correctly stated and, so far as we can tell from the record before us, correctly applied the appropriate standards in this case. We affirm for the reasons stated below.

## I. Background

The extensive factual background has been discussed in detail in *Boggs v. Bowron*, 842 F.Supp. 542, 544–46 (D.D.C.1993), *aff'd*, 67 F.3d 972 (D.C.Cir.1995) (unpublished table decision), and *Boggs v. Merletti*, 987 F.Supp. 1, 3–6 (D.D.C.1997), and we need not reiterate it here. We supply only the detail necessary to explain our decision. Art is supposed to imitate life, but when the subject matter is money, if it imitates life too closely it becomes counterfeiting. Boggs creates *trompe l'oeil* (so lifelike as to fool the eye) images of U.S. currency with alterations such as substituted names or pictures, or non-existent denominations, but generally with the same size, shape, layout and color as legal tender. Boggs then barters his drawings in return for goods and services. He has spent thousands of his pictures as currency since he began this project. No one contends that Boggs intends to defraud his customers. Boggs explains to the people receiving his bills that he is an artist and that the bills are not real cash. He then engages them in a discussion on the value of money and the social and political institutions that underlie the system of exchange. But the transactions do not end there. Boggs's ultimate customers come to him to purchase the entire transaction. Boggs gives them a receipt for the goods he purchased, the change he received, and the name of the person who accepted his "Boggs Bills" as payment. The buyer goes to the holder of the Boggs Bill and negotiates a purchase price. Boggs then works with the buyer, putting together a display including the art work, the receipt and the change.

Because of the nature of his work, Boggs has drawn the attention of the counterfeiting investigators of the Secret Service on many occasions, although he has never been criminally prosecuted. This case arose because in two separate events, in Cheyenne, Wyoming, in 1991 and Pittsburgh, Pennsylvania, in 1993, Secret Service agents seized Boggs's artwork as contraband counterfeit bills violating the requirements of 18 U.S.C. § 474.

In Cheyenne, Secret Service agents were told that Boggs had tried to buy goods at a local Kmart, explaining that he wanted to get face value for a $100 Boggs Bill. A Secret Service agent and the U.S. Attorney for the District of Wyoming visited his hotel room without a warrant and, after what Boggs characterized as tense negotiations conducted under the threat of arrest, fifteen Boggs Bills were taken from his hotel room. Boggs was never criminally prosecuted.

In Pittsburgh, Boggs planned to proceed on a much grander scale. He conceived and publicized "Project Pittsburgh," his plan to spend $1 million in Boggs Bills in the Pittsburgh area, asking each recipient to pass the bill 5 times before taking it out of circulation. In November 1992, officials from the United States Attorney's office and the Secret Service met and discussed Boggs's plans. The group decided that Boggs could not be allowed to distribute $1 million in Boggs Bills. Secret Service agents acting pursuant to warrants seized more than 1,300 items from Boggs's home and studio.

Boggs requested the return of all of his property, exhausted his administrative remedies and began this action.

## II. Proceedings in the District Court

Boggs filed an action in the district court on September 3, 1993, seeking an injunction against prosecution and the return of the Boggs Bills seized in Cheyenne and Pittsburgh. On December 9, 1993, the district court denied the preliminary injunction and refused to enjoin future prosecution. *See Bowron*, 842 F.Supp. at 562–63. The district court also ruled that 18 U.S.C. §§ 474 and

504 are constitutional on their face and as applied. Boggs filed an interlocutory appeal with this court on the First Amendment issue, seeking a ruling that the First Amendment prevented the counterfeiting sections from applying to his work. In October, 1995, on interlocutory appeal we upheld the district court's decision that the statute was constitutional. We affirmed the district court's denial of injunctive relief and remanded. *See Boggs v. Bowron,* 67 F.3d 972 (D.C.Cir.1995) (unpublished table decision).

Following remand, both parties made cross-motions for summary judgment. Boggs argued that the warrantless seizure in Cheyenne and the seizure without a prior hearing in Pittsburgh violated heightened First Amendment procedural guarantees for presumptively expressive materials, and that the appropriate remedy was return of the seized goods. Boggs also argued that the heightened standards previously applied in obscenity cases, including the right to a pre-seizure adversarial hearing, should have been applied in this case. The government argued that the First Amendment's heightened standards do not apply, and that a judicial hearing is not constitutionally required after the seizure of counterfeit currency. The government also argued that it could not be required to return the Boggs Bills because they are contraband prohibited by 18 U.S.C. §§ 474 and 481.

Boggs moved for a hearing in open court to determine if the bills were contraband *per se* and was denied one by the district court. On October 23, 1997, the district court inspected *in camera* all of the Boggs Bills seized in Pittsburgh. The court agreed with the Secret Service that certain bills were contraband within the meaning of sections 474 and 481 of the criminal code, and that they could not be returned to Boggs. The district court therefore granted the government's motion for summary judgment and dismissed the case with prejudice.

### III. Analysis

#### A. *Contraband per se*

■ We need not determine whether the Cheyenne seizure was legal under the Fourth Amendment because Boggs does not challenge the premise that if the seized bills violate the likeness or similitude standards in 18 U.S.C. § 474, they are contraband *per se* and cannot be returned. Contraband *per se* comprises objects which are inherently unlawful to possess, regardless of how they are used. As we explain below, the Boggs Bills in this case fall within that category. The district court properly noted that "[i]ndividuals have no property right in contraband materials and contraband materials may not be returned to them." *Merletti,* 987 F.Supp. at 10. This Circuit addressed the issue in *United States v. Farrell,* 606 F.2d 1341, 1344 (D.C.Cir.1979):

> Decisional law recognizes two kinds of contraband. Traditional or *per se* contraband is defined as "objects the possession of which, without more, constitutes a crime." *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). It is well established that a claimant has no right "to have [*per se* contraband] returned to him." *United States v. Jeffers,* 342 U.S. 48, 54, 72 S.Ct. 93, 96, 96 L.Ed. 59 (1951); *Trupiano v. United States,* 334 U.S. 699, 710, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

We now turn to whether the District Court correctly found that the Boggs Bills were contraband *per se.*

#### B. *First Amendment Considerations*

■ The main thrust of Boggs's argument is not that the district court erred in its determination that the Boggs Bills violate the statutory requirements, but rather that the district court erred in looking at the bills at all. Boggs argues that special procedures established by the Supreme Court under the First Amendment protecting books and films in obscenity cases apply with equal force to his artwork. The Supreme Court has indeed held law enforcement officers to a higher standard when presumptively expressive materials are involved because of the risk of prior restraint and censorship. *See, e.g., Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 63, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) (recognizing the risk of prior restraint); *see also Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) (holding

that seizure of expressive materials in some instances requires additional safeguards); *Heller v. New York,* 413 U.S. 483, 491–92, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); *Huffman v. United States,* 470 F.2d 386, 392 (D.C.Cir. 1971). Boggs suggests that the Secret Service should have met more stringent warrant requirements and that he should have been granted a prior adversarial hearing before an independent judicial officer. We disagree.

The cases Boggs cites are all obscenity cases, where significant judgment was needed to determine if the seized materials violated community standards. We need not determine the range of cases to which additional protection would apply. We simply hold that on the facts before us, they do not. The important First Amendment concerns advanced by the Supreme Court in the obscenity cases are not present to the same extent here. Boggs's artwork is designed to look like money. While some judgment is needed on the part of the officers charged with enforcing the counterfeiting statutes, the inquiry is not inherently content-based and thus poses little risk of acting as a prior restraint on expressive materials.

### C. *In Camera Examination*

■ Boggs objects to the district court's *in camera* examination of the bills when ruling on the motions for summary judgment. He also alleges that there may have been inappropriate *ex parte* communication between the government and the district court when the Boggs Bills were submitted. We hold that he has no right to have the evidence examined in open court on motions for summary judgment. *See Spark v. Catholic Univ. of Am.,* 510 F.2d 1277, 1280 (D.C.Cir.1975) (district court may "dispense with oral arguments in appropriate circumstances in the interest of judicial economy"). The district court awarded summary judgment in this case in accordance with FED. R.CIV.P. 56(c) which states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

ment as a matter of law." It is common practice for trial judges to examine not only written evidence, but also exhibits when deciding if there is a genuine issue of material fact. The existence of the specific bills is not a genuine issue of fact. The district court was applying the law to the bills before it to determine if they violated the counterfeiting statutes and were forfeit as contraband. We find nothing unusual in the district court conducting an *in camera* examination of the relevant evidence here. It appears that the district court properly examined the items submitted to it by the Secret Service, and there is nothing in either the district court's memorandum opinion or the record to suggest that it relied on any *ex parte* communication in reaching its decision.

Boggs now complains that he cannot tell from the record what was submitted, but he received notice from the government listing the items submitted. *See* Defendants' Notice of In Camera Submission, *reprinted in* Joint Appendix at 263 (listing the materials being presented to the court). Boggs was free to request access to the materials at that time. He did not. He failed to make a timely objection to the submission below, and did not move to supplement the record here under FED. R.APP. P. 10(e) or otherwise. If there was error, we hold that it was insignificant and Boggs could have avoided any ill effect by proper motion below.

### D. *Wrong Standard*

■ Finally, we find that Boggs's argument that the district court applied the wrong standard has no merit. We have already considered and upheld the district court's constitutional analysis. We now hold that the district court correctly stated the standard under 18 U.S.C. § 492, which provides in pertinent part:

All counterfeits of any coins or obligations or other securities of the United States or of any foreign government, or any articles, devices, and other things made, possessed, or used in violation of this chapter or of sections 331–333, 335, 336, 642 or 1720, of this title, or any material or apparatus used or fitted or intended to be used, in the making of such counterfeits, articles,

devices or things, found in the possession of any person without authority from the Secretary of the Treasury or other proper officer, shall be forfeited to the United States.

The district court correctly found that the statute prohibits the possession of bills made or executed after the similitude of United States obligations. Examining certain of the bills seized in Pittsburgh, the district court concluded that

> all of the items that the Secret Service contends are contraband are, to this court's satisfaction, reproductions of genuine currency of the United States or reproductions of genuine foreign currency. Each are in the likeness and similitude of genuine currency and therefore in violation of 18 U.S.C. §§ 472 or 481. Each reproduction has the general design and appearance of genuine United States or foreign currency. None of the pieces in dispute meet the size and coloration exemptions of 18 U.S.C. § 504 and 31 C.F.R. 411.1. This court is therefore compelled to hold that [the disputed items] are contraband. These items are therefore forfeited to the United States without the necessity of forfeiture procedures.

*Merletti*, 987 F.Supp. at 11. The district court properly applied the same analysis regarding the bills seized in Cheyenne.

 Boggs now asks us to overturn the district court's grant of summary judgment on the merits. On brief, he opposed the government's offer to present the Boggs Bills to this court, only changing his position during oral argument. After oral argument, he moved to supplement the record, and now asks that he be allowed to argue the merits of the district court's determination that the bills violate the counterfeiting statute. This is simply too late in the appellate process, and we hold that he has waived any right to our full examination of the evidence. Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that the appellant's argument "contain 'the contentions of the appellant with respect to the issues presented, and

the reasons therefor, with citations to the authorities, statutes and parts of the record relied on.'" *See Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983) (refusing to determine issue that had not been fully briefed by parties). If Boggs wished this court to make a full reexamination of the merits of the grant of summary judgment, it was his duty as appellant to request that this court do so and present argument on that question. We will not consider at this late stage an argument that the appellant failed to raise.

## IV. Conclusion

We conclude that the district court did not err either in the procedure it followed or the standard it applied in ruling on the motions for summary judgment before it and concluding that the bills it examined were forfeit as contraband. The judgment of the district court is affirmed.

ROGERS, Circuit Judge, concurring in part and dissenting in part:

The court affirms on de novo review the district court's grant of summary judgment by concluding that "art" it has never seen is "so far as we can tell" contraband per se. *See* opinion at 39. Boggs should not be too surprised by this result, as his appeal focused on his First Amendment procedural claim without explicitly contending that his art does not meet the statutory definition of counterfeit currency. Rather, he contended that the district court applied the wrong standard in concluding his art was counterfeit under 18 U.S.C. § 474. But on de novo review, where this court "sits in the same position as the district court,"[1] we cannot truncate Boggs' contentions as quickly and neatly as the court would like.

Implicit in Boggs' challenge to the manner in which the district court reviewed his work and the gloss the court imposed on 18 U.S.C. § 474 is the assumption that if he does not prevail on these claims, the question of the legal status of his bills will remain open for the court. Indeed, the first paragraph of his

---

1. *Stroup v. GCS Serv., Inc.,* 938 F.2d 20, 22 (2d Cir.1991); *Bloomington Nat'l Bank v. Telfer,* 916 F.2d 1305, 1307 (7th Cir.1990); *T.W. Elec. Serv.* *Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

argument in his brief cites a decision from this court noting that we have an obligation to make an independent examination of the record as a whole in cases implicating the First Amendment. Appellant's Brief at 15 (citing *Liberty Lobby, Inc. v. Rees,* 852 F.2d 595, 598 (D.C.Cir.1988) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964))). In the last paragraph of his brief he seeks, as an alternative to reversal and prompt return of his property, further proceedings with respect to the remaining materials. *Id.* at 32. Moreover, in its brief the government relied on the fact that this court must "undertake its own independent analysis ... of whether the bills in question are 'in the likeness of' or 'after the similitude of' genuine currency within the meaning of Criminal Code § 474" in maintaining that whether the district court viewed the bills in camera "is simply beside the point to the issue presented to this Court." Appellee's Brief at 12. In response, Boggs contended that the government has never demonstrated that each of the seized items is contraband per se. Reply Brief at 2.

Of course, Boggs might have stated his argument more clearly by explicitly requesting what he sought implicitly, but his failure to take the formal step of adding a sentence to his brief seeking a de novo examination by this court of each seized item does not warrant the dispositive significance attached to it by the court. The court's rigid insistence on formality is particularly inappropriate here because in his complaint filed in the district court Boggs expressly challenged the government's "mistaken" interpretation of § 474, *see* Complaint at ¶ 21, and he sought a hearing before the district court to oppose the government's classification of his art as contraband. Given that this case involves gov-

ernment regulation—indeed, confiscation—of expressive materials, and that art may at times imitate reality,[2] this court is obliged on de novo review of the grant of summary judgment to look at the Boggs bills to determine if they meet the statutory criteria for counterfeit currency.[3]

Without viewing the bills, this court cannot determine for itself whether the district court correctly applied the law, or even if it applied the correct law. It is not sufficient to rely, as the court does, *see* opinion at 41, on the district court's recitation of the correct statutory standards. Elsewhere in its opinion, the district court described 18 U.S.C. § 474 as essentially objective, yet it appears to incorporate a substantial degree of subjectivity.[4] In addition, the district court's findings that a sponge and bow tie are in the "similitude" of actual currency raise questions about its statutory interpretation that warrant scrutiny on appeal.

Any doubt that reviewing the Boggs bills is appropriate should have been dispelled by the government's advocacy of the same result. In its brief, the government invited this court to review the bills, and it even brought its trove of confiscated art to the oral argument. Only at oral argument—after Boggs orally moved to supplement the record and the government saw the possibility of affirmance without exposing the Boggs bills to further judicial scrutiny—did the government retreat from its prior position of openness. Indeed, it is somewhat ironic that in an opinion that turns on the concept of waiver, the court ignores the government's repeated acceptance of the outcome that the court now deems Boggs to have foreclosed.

Moreover, reviewing the Boggs bills would not be arduous, at least not as the court

---

2. Labeling a counterfeit bill "art" will not save it from the Secret Service's incinerator, but at some point, an artwork's loose resemblance to currency will not strip it of First Amendment protection. *Cf. Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (invalidating and upholding portions of § 474). Congress struck a balance between these extremes in § 474, and it falls to this court to determine whether, in the judgment of Congress, Boggs' art imitates reality too effectively.

3. Our obligation is particularly clear in light of declarations from an art professor and a muse-

um curator attesting to the artistic integrity of Boggs' work. A third declaration, from a distinguished art historian, notes the historical pedigree of Boggs' decision to create images of money, and reminds us that since as early as 1886, the sensibilities of American artists and anti-counterfeiting authorities have collided.

4. No one disputes that Boggs raised a timely challenge to the district court's interpretation of § 474.

suggests.[5] *See* opinion at 40. If this court supplements the record, it would be in the same position as the district court, which rendered its decision after viewing the bills without conducting a hearing and apparently without relying on extraneous source material. The court's resolution of appellant's First Amendment claim characterizes § 474 as requiring relatively objective judgments that a law enforcement officer can make without need for an adversarial pre-seizure hearing before a magistrate. *See* opinion at 40. If § 474 is as easy to apply as the court says it is, there should be no difficulty in reviewing the Boggs bills without further argument from the parties. It may well be that Boggs focused on procedural claims rather than the merits of the district court's *in camera* review to postpone an affirmance that he may perceive as inevitable, but we will not know until we look.

The court's reliance on Fed. R.App. P. 28(a), *see* opinion at 42, is therefore insufficient to abrogate its obligation to review the Boggs bills de novo.[6] As this circuit has noted, Rule 28 does not automatically require ignoring issues that a party fails to present clearly in its brief. Rather, "substantial public interests" or the need to avoid an "unduly harsh" result justify relaxing traditional foreclosure principles. *Consumers Union v. Federal Power Comm'n*, 510 F.2d 656, 662 n. 10 (D.C.Cir.1975). In such cases, a "balancing of considerations of judicial orderliness and efficiency against the need for the greatest possible accuracy in judicial decisionmaking" warrants appellate review of ostensibly waived issues. *Id.* at 662; *see also Columbia Gas Transmission Corp. v. FERC*, 844 F.2d 879, 880 (D.C.Cir.1988).

Because this court is unable to review the district court's interpretation of § 474—which it purports to affirm—without viewing the Boggs bills, I would grant Boggs' motion

to supplement the record to include the confiscated Boggs bills and would view the bills in order to determine de novo whether they fall within the statutory definition of counterfeit currency. Accordingly, I dissent from Part III(D) of the court's opinion.[7]

---

5. Of course, arduousness could hardly be determinative of this court's responsibility on de novo review.

6. The court has authority under Fed. R.App. P. 10(e) to supplement the record "on its own initiative."

7. With respect to Boggs' claim that the district court erred by viewing the bills *ex parte,* I concur

in the opinion of the court only to the extent that its relies on Boggs' failure to seek access to the bills during the district court proceedings. While the district court's procedure does not result in reversible error, it is impossible to characterize *ex parte* receipt of unknown materials not in the record as "insignificant." I also concur in the court's holding that *in camera* review was otherwise appropriate.